**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **JAMES GOLD,** | ) | |
| **MICHAEL MCMAHON, &** | ) | |
| **HY SAPORTA** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No.  1:17-cv-734 (CKK)** |
| **v.** | ) | |
| | ) | |
| **MICHAEL MAURER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION**
**FOR A TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION IN AID OF ARBITRATION**

Defendant, Michael Maurer, respectfully opposes Plaintiffs' Motion for a Temporary

Restraining Order and Preliminary Injunction in Aid of Arbitration ("Plaintiffs' TRO Motion")

and Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' TRO Motion

("Plaintiffs' Memorandum in Support").  Plaintiffs fail to establish evidence warranting "the

extraordinary and drastic remedy of a temporary restraining order."  *See Mattiaccio v. DHA*

*Grp., Inc.*, 928 F. Supp. 2d 251, 255 (D.D.C. 2013) (citing *Tolson v. Stanton*, 844 F. Supp. 2d 53,

56 (D.D.C. 2012) (citation omitted)); *see also CityFed Fin. Corp. v. Office of Thrift Supervision*,

58 F.3d 738, 746, 313 U.S. App. D.C. 178 (D.C. Cir. 1995).  Plaintiffs rely on speculation,

rumor, and unresolved factual disputes in seeking a restraining order and preliminary injunction.

Plaintiffs' TRO Motion is premised on inaccurate information – that Maurer had a

meeting scheduled with Raymond James this week.  Maurer has no such meeting scheduled.

The extensive factual and legal disputes in this case case are properly before the American

Arbitration Association, which sent a letter of initiation on April 26, 2017.  *See* Exhibit 1,

1

Affidavit of Michael P. Maurer, ¶ 39 ("Ex. 1, Maurer Affidavit, ¶ 39").  Maurer has asked

Plaintiffs to withdraw Plaintiffs' TRO Motion because it is moot, but Plaintiffs refused.

## I.    RESPONSE TO COURT'S ORDER

On April 24, 2017, the Court instructed Defendant to represent in the instant Response

"whether or not he would agree to not repeat the statements described on pages 5 and 6 of the

TRO Motion at the meeting described on page 7 of the TRO Motion."  *See* April 24, 2017

Minute Order.  Defendant cannot agree.

First, the meeting described on page seven of Plaintiffs' TRO Motion does not exist.

Plaintiffs write:

> On information and belief, Mr. Maurer has set up a meeting with executives of the
> financial company which provides essential services to Steward, to occur as soon as
> next week.[1]  On information and belief, Mr. Maurer intends to publish additional
> defamatory statements at this meeting.

Maurer assumes that Plaintiffs are referring to a meeting he is working to schedule with a

representative or representatives from the company Raymond James, but he cannot know that for

sure based on the pleading.  Plaintiffs have not indicated whether that is the correct non-

scheduled meeting.  Nevertheless, Maurer has a longstanding financial relationship with

Raymond James that predates his formation of Steward Partners and is separate from any

relationship with Steward or the Plaintiffs.  *See* Ex. 1, ¶¶ 3-4.  Maurer also has personal

relationships with Raymond James employees, including his own brother and sister-in-law.  *Id.*

at ¶¶ 5-6.

Second, Maurer cannot imperil himself by agreeing to refrain from making statements

like the ones outlined on pages 5-6 of Plaintiffs' TRO Motion because those statements are not

---

[1] Plaintiffs filed the TRO Motion on April 20, 2017; thus "next week" refers to this week, April 24-28, 2017.

false.  Contrary to Plaintiffs' representations, Maurer believes the statements are true.  *See* Ex. 1, ¶¶ 12-13.

Third, Maurer must protect himself.  He has been expelled from the company he founded, stripped of the massive investment he made in launching Steward, and is now unemployed. Maurer believes Plaintiffs have disparaged him both within and outside the company.  *See* Exhibit 3, Email from Maurer to Raymond James officials on March 6, 2017 ("Ex. 3, March 6 email").  Maurer is trying to maintain longstanding and important business relationships for future jobs.  He intends to, and has the right to, answer questions honestly about circumstances surrounding his departure from Steward Partners – a company he founded and was the face of. He intends to handle communication in a manner that is similar to the reasonable email he sent on March 6.  *See id.*

Ultimately, Plaintiffs seek to prevent Maurer from communicating with others in the industry by claiming defamation on utterances that have not yet been spoken.  Nothing Maurer has said constitutes defamation.  The parties to this matter have strong, disparate opinions about what transpired and these are issues for the arbitrator to address.

## II.    STATEMENT OF FACTS

1. Maurer founded Steward Partners in 2013, with his wife, Christa Maurer.  Ex. 1, ¶ 16.

2. Maurer invested significant savings into forming Steward Partners.  *Id.*

3. After months of negotiations, Maurer signed a ten year contract with Raymond James in September 2013.  *Id.* at ¶ 17.

4. When Maurer established Steward Partners, he held 100% of the equity.  *Id.* at ¶ 18.

5. Also in 2013, Maurer hired James Gold.  *Id.* at ¶ 19.

6. Maurer later learned that drinking to excess and inappropriate behavior were the reasons Gold had left his previous job at Morgan Stanley.  *Id.*

7.  In 2013, Michael McMahon became Steward Partners' Chairman of the Board.  *Id.* at ¶ 20.

8.  Gold and McMahon informed Maurer that they were "distant cousins."  Maurer learned later that they were close relatives.  *Id.* at ¶ 21.

9.  Maurer hired Hy Saporta in February 2014.  *Id.* at ¶ 24.

10. In June 2015, the night before a meeting of the Board of Directors, Gold and several Directors gathered at the Fitz Bar for drinks.  Gold had a number of alcoholic beverages and launched into a series of expletive-laden rants derogatory to Maurer in front of the Directors.  *Id.* at ¶ 25.

11. In July 2015, Maurer took short-term disability leave due to a medical condition.  *Id.* at ¶ 26.

12. Gold used racist epithets to describe employees in front of members and Directors.  *Id.* at ¶ 27.

13. Gold referred to himself as "big daddy" and to female employees as "Charlie's Angels." *Id.* at ¶ 28.

14. During the Spring of 2016, Gold spent $25,000.00 on a paid advertisement (essentially an infomercial) without the consent of the other Directors, violating the expense approval agreement in the Operating Agreement.  Additionally, the spot was not a part of the branding and marketing strategy developed and approved of by Steward's directors.  There was no need to pay for advertising because Maurer and Steward Partners had been featured in the Business Section of *The Wall Street Journal*, as well as many other financial services publications and websites without paying for coverage.  *Id.* at ¶ 29.

15. By September 2016, Maurer had become deeply concerned by Saporta's and Gold's actions and corporate governance.  Maurer emailed McMahon asking for a meeting to discuss his concerns and the need for stricter corporate governance.  *Id.* at ¶¶ 30-31.

16. Maurer, Saporta, Gold, and McMahon exchanged drafts and edits of a new Steward operating agreement during the fall of 2016.  *Id.* at ¶ 32.

17. In December 2016, Saporta pressured Maurer to sign a new Operating Agreement without reviewing it.  *Id.* at ¶ 13.

18. Maurer wrote an email on December 15, 2016, because he believed he must advise the recipients of Gold's aggressive behavior to protect himself and his company.  He wrote:

> I simply want to work with you all to complete and Executive Employment Agreement that is fair to The Founder *(sic)* of our company, protects me and my family while also acting in Steward Partners *(sic)* best interest. That has been my intention all along.

Maurer continued:

> In an effort to keep this cordial and in the spirit of a culture of caring I would very much appreciate if we kept this matter private …. Someone other than myself needs to inform them where [their] authority begins and ends. Any further involvement by those mentioned will be in direct violation of our operating agreement and sincerely would not be helpful. Mike McMahon has called me a gentleman at least a dozen times. I have done right by [Gold] and [Saporta] by increasing [their] roles and giving them millions of my shares. I intend to act as a gentleman and look forward to speaking with you.

*See* Exhibit 2, Email from Maurer to Gary Miller et al, December 15, 2016 ("Ex. 2, December 15 email").

19. Gary Miller, a Director on the Board, responded, "wtf?  call[.]" the same day. *Id.*

20. Shortly thereafter, an attorney for Steward Partners, John Scanlon, notified Maurer that a hearing would be convened by a special committee to address Maurer's allegations against Gold, Saporta, and McMahon. *Id.* at ¶ 34.

21. The telephonic hearing took place on January 9, 2017. During the call, Maurer raised concerns about Steward's corporate governance and internal controls. *Id.* at ¶ 35.

22. On January 11, 2017, Scanlon asked Maurer to provide a written statement of his concerns to the committee. Maurer sent an email to the special committee with a copy of the 2016 Operating Agreement that contained the edits Maurer had made to address his ongoing corporate governance concerns. *Id.* at ¶ 36.

23. On January 13, 2017, Miller emailed Maurer asking Maurer to retract Maurer's December 15, 2016 email and apologize for it. Miller wrote that both parties had set the allegations and counterclaims aside because they remained an impediment to resolving the issues. Maurer felt pressured by this statement to recant his allegations. *Id.* at ¶ 37.

24. Maurer was ousted from Steward later in January. *Id.* at ¶ 38.

25. On March 6, 2017, Maurer emailed Scott Curtis, Brock Guice, and Donna Loufman, all of Raymond James. He wrote, in part:

> The how and why of my separation from Steward is likely to be the subject of extensive litigation. My attorneys and I are confident that at the end of litigation,

my rights will be vindicated.  While I am very upset about the actions taken against me, I do not believe that it is appropriate to use this moment as an opportunity to cast aspersions on the various actors involved.  Unfortunately, I have reason to believe that Steward is making various accusations about me in public that are both hurtful and false.  We have known each other for some time and I draw comfort knowing that you will view such communications with appropriate skepticism.

Ex. 3.

## III.    ARGUMENT

### A.  Plaintiffs Have Not Shown a Likelihood of Success on the Merits.

Plaintiffs fail to establish that the statements they articulate as defamatory are false, that Maurer was negligent in making the statements, or that Plaintiffs were harmed by the statements. In order to succeed on their defamation claims, Plaintiffs must show: (1) that Maurer made a false and defamatory statement about the plaintiffs; (2) that Maurer published the statement without privilege to a third party; (3) that Maurer's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.  *Mattiaccio*, 928 F. Supp. 2d at 256 (citing *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1088, 377 U.S. App. D.C. 434 (D.C. Cir. 2007)).

Plaintiffs have not established that the statements listed on pages 5-6 of Plaintiffs' TRO Motion were false.  Maurer believes the statements are true based on facts known to him.  *See* Ex. 1.  Plaintiffs have not included a statement from James Gold disputing Maurer's characterization of Gold's interactions with him.  Saporta wrote in his affidavit that Maurer's statements about Gold threatening him and wanting to drop an Anvil on his head were false.  But Plaintiffs provided no basis for Saporta's purported knowledge of these conversations. Similarly, Plaintiffs failed to include a statement from McMahon disputing that McMahon

shared confidential information from Maurer with others.  Saporta writes that McMahon did not share confidential information, but again provides no basis for his knowledge.

Maurer also believes Plaintiffs have been enriched by expelling him from the company. They have gained power, as in a power-grab, and gained ownership interest in Steward. **Plaintiffs have presented no evidence to demonstrate that the Plaintiffs were not enriched by ousting Maurer.**  If Plaintiffs gave Maurer's responsibilities and financial stake in the company to someone else rather than to themselves, they have not indicated as such.  It is Maurer's understanding that Plaintiffs' own ownership interests have increased.  *See* Ex. 1, ¶ 14. Plaintiffs have not presented sufficient information from which the Court could conclude that the statements attributed to Maurer and his counsel were false.  Therefore, the first factor weighs against granting Plaintiffs' TRO Motion.

Plaintiffs have not established fault by Maurer in making the statements.  Plaintiffs claim that Maurer made the allegations maliciously, but that is inaccurate.  *See* Plaintiffs TRO Motion at 9.  Maurer believed and continues to believe that the statements he made were true.  *See* Ex. 1. Maurer wrote the December 15, 2016, email because he believed he needed to advise the recipients of Gold's aggressive behavior to protect himself and his company.  Maurer's contemporaneous explanation is most relevant.  He wrote,

> I simply want to work with you all to complete and Executive Employment Agreement that is fair to The Founder *(sic)* of our company, protects me and my family while also acting in Steward Partners *(sic)* best interest.  That has been my intention all along.

Maurer continued,

> In an effort to keep this cordial and in the spirit of a culture of caring I would very much appreciate if we kept this matter private ….  Someone other than myself needs to inform them where [their] authority begins and ends.  Any further involvement by those mentioned will be in direct violation of our operating agreement and sincerely would not be helpful.  Mike McMahon has called me a

7

> gentleman at least a dozen times. I have done right by [Gold] and [Saporta] by increasing [their] roles and giving them millions of my shares. I intend to act as a gentleman and look forward to speaking with you.

Ex. 2. Reading the entirety of Maurer's thoughtful email demonstrates that Plaintiffs significantly abbreviated and mischaracterized his statements. *See id.*

Likewise, Maurer's March 6, 2017 email was not malicious and contained nothing defamatory. *See* Ex. 3. Maurer wrote to Scott Curtis, Brock Guice, and Donna Loufman, all of Raymond James:

> The how and why of my separation from Steward is likely to be the subject of extensive litigation. My attorneys and I are confident that at the end of litigation, my rights will be vindicated. While I am very upset about the actions taken against me, I do not believe that it is appropriate to use this moment as an opportunity to cast aspersions on the various actors involved. Unfortunately, I have reason to believe that Steward is making various accusations about me in public that are both hurtful and false. We have known each other for some time and I draw comfort knowing that you will view such communications with appropriate skepticism.

*Id.* Plaintiffs' claim that this reasonable, restrained communication is defamatory and malicious is patently absurd. Plaintiffs appear to be seeking to prevent Maurer from communicating with his friends and colleagues at Raymond James. Nothing in the record, other than Saporta's unsupported and self-serving statements in his affidavit, support Plaintiffs' position that Maurer negligently or maliciously defamed Plaintiffs. Indeed there is no evidence (much less direct evidence) that there statements were inaccurate.

**B. Plaintiffs Have Not Established Irreparable Injury.**

In addition to a likelihood of success on the merits, Plaintiffs must demonstrate that irreparable injury is likely in the absence of an injunction, and not a mere possibility. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). The injury identified must "be both certain and great; it must be actual and not

8

theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674, 244 U.S. App. D.C. 349 (D.C. Cir. 1985).

Plaintiffs claim of irreparable injury fails because Plaintiffs fail to show they will suffer irreparable injury if Maurer makes statements identical or similar to those identified in Plaintiffs' TRO Motion much less that said unspecified injury is likely to occur.  They claim only financial injury, which is the very definition of a reparable injury – particularly whereas they have filed a Complaint seeking monetary damages in arbitration for the exact same statement.

Further, Plaintiffs pled no injury with a sufficient degree of specificity.  Instead, Plaintiffs claim they have suffered injury by Maurer making generalized statements without support. Plaintiffs claim that Maurer's words "affected Steward's ability to consummate business deals and recruit top-tier candidates, have damaged Plaintiffs' reputations, and have caused, and will cause serious injury to Steward's business."  Plaintiff's TRO Motion at 13.  The support for this claim is Saporta's affidavit.  But Saporta's affidavit is not specific.  He wrote, "Steward's potential recruits, clients, and potential clients have contacted me, and the other Plaintiffs, to stall, limit, or retract current and prospective deals or arrangements with Steward due to the negative press."

Saporta fails to indicate how many such instances occurred or any other specifics about who contacted him, what deals were stalled, limited, or retracted, and how much, if any, money Steward lost as a result.  Saporta also provides no reason for the Court to conclude that, even if the Plaintiffs were injured, the injury would be irreparable.  As in *Mattiaccio*, the risk of injury here "remains theoretical rather than certain."  928 F. Supp. 2d at 257.

Plaintiffs also produce no specific evidence to demonstrate that any such irreparable injury is *likely* to occur.  Plaintiffs TRO Motion was premised entirely on false information – that

Maurer had a meeting scheduled this week with Raymond James.  That was incorrect.  Plaintiffs produce no more accurate information to demonstrate that they are likely to suffer harm if Maurer makes the same statements again that he made in December 2016 and March 2017.  If anything, logic suggests the opposite – Maurer has already made these statements to Raymond James officials and repeating them is unlikely to cause further harm.

Finally, the Court has considered a plaintiff's inclusion of the allegations in public filings when determining injury to the plaintiff.  *Mattiaccio*, 928 F. Supp. 2d at 256-57 (noting that the plaintiff made the allegedly defamatory report public when he attached it to his Complaint and finding that once the plaintiff had done so, he "cannot claim that disclosing the report to a third party will cause *irreparable* damage at the point any person with access to the Internet can review the report at will." (emphasis in original)).  Just as in *Mattiaccio*, Plaintiffs included the alleged defamatory statements in their Complaint and TRO Motion – both of which are now publicly filed documents.  Plaintiffs' attorneys did not seek to seal either document.  Plaintiffs, through their counsel, have now repeated these would be future defamatory statements public. Maurer would not be able to cause any further injury by repeating these statements that Plaintiffs' attorneys have now made available to the public.  This factor weighs heavily against granting Plaintiffs' TRO Motion which seeks to curtail hypothetical future speech.

Ultimately, on this sparse record premised on a false claim of a meeting and heavily truncated statements from emails, Plaintiffs cannot prevail.

## IV. CONCLUSION

Based on the foregoing, Maurer respectfully requests that the Court deny Plaintiffs TRO

Motion.

Respectfully submitted,


____/s/_____
Katherine R. Atkinson
Ari Micah Wilkenfeld
Wilkenfeld, Herendeen & Atkinson
1731 Connecticut Avenue, NW
Third Floor
Washington, DC 20009
T: 202.765.2253
F: 202.600.2792
katherine@wilkenfeldlaw.com